Date signed August 08, 2011



IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
at GREENBELT

| | | | |
|---|---|---|---|
| In Re: | * | | |
| Jin Suk Kim Trust d/b/a La Union Mall | * | Case No. | 11-14033-TJC |
| | * | Chapter | 11 |
| Debtor | * | | |

*********************************************************************

## MEMORANDUM OF DECISION

La Union Center LLC (the "Movant") seeks dismissal of this Chapter 11 case claiming that debtor Jin Suk Kim Trust (the "Debtor") is not eligible to file a bankruptcy petition because it is not a "business trust." The Debtor opposes the dismissal motion. For the reasons set forth herein, the Court concludes that the Debtor is a "business trust" as that term is used in 11 U.S.C. §101(9)(A)(v) and therefore will deny the motion to dismiss.

### FINDINGS OF FACT

On or about January 1, 1993, Jin Heang Chung executed the Irrevocable Trust Agreement (the "Trust Agreement") thereby creating the Jin Suk Kim Trust (the

"Debtor"). Jin Heang Chung was the grantor (the "Grantor" and also referred to at times as "her mother"). The Trust Agreement named Jin Suk Kim, the Grantor's daughter ("Kim"), as the trustee and life income beneficiary. Kim has been the only person designated as the trustee under the Trust Agreement although, as explained more fully below, Robert Harris signed documents as the "Trustee" for a short period prior to 2009.

The Debtor was established to be a generation skipping trust that allowed the original trust corpus to be passed on to the beneficiaries named by Kim in her will while (supposedly) providing income to Kim, the Grantor's only child. The facts in the foregoing sentence were established by the testimony of Movant's expert, Mark Feinberg. The Trust Agreement does not contain a statement of purpose other than to state that the transfer is made for "the uses and purposes" set forth therein, and that the trustee "shall collect the income arising from the principal . . . [and] shall dispose of income and principal" in accordance with the Trust Agreement. Ex. 3 at 1. No one, including the Grantor, ever had any discussions with Kim about the purpose of the Debtor or why it was created. No one explained to her the duties or obligations of a trustee, or whether she should operate the Debtor any differently than she operated her other businesses. No evidence was introduced by any party as to who is named in Kim's will, although it seems quite apparent that it will be Kim's family members.

Kim, whom the Court found to be entirely credible,[1] had no real understanding of why her mother created the Debtor. Further, these matters were not particularly important to her, because her focus has been on building wealth in the Debtor for the benefit of her family as a whole.

---

[1] Kim speaks very broken English. Nevertheless she communicates in English well enough that the Court was able to understand her testimony fully.

The Trust Agreement provided that Kim, the trustee, "shall pay" to herself "all of the net income of the trust . . . ." Ex. 3 at ¶2. In addition, Kim also was authorized to pay to herself

> such sums from the principal of the trust estate hereunder as the Trustees, in their sole discretion, may deem necessary or advisable for her support and health, or to maintain her in the standard of living to which she has been accustomed.

*Id*. In fact, Kim never made any distributions of net income or principal to herself (or anyone else, for that matter), instead retaining and reinvesting all profits so as to maximize the value of the Debtor's assets and enable the Debtor to acquire additional real estate investments, as described herein.[2]

The Trust Agreement gave Kim, the trustee, broad powers to invest the Debtor's assets as she saw fit and provided her substantial protection from liability for losses:

> [the Trustee is not] limited to the class of investments permitted by any statute, law or rule of court relating to the investment in trust funds, and the Trustee shall not be required to diversify the investments of the trust property except to such extent as they deem advisable.
>
> ********
>
> The trustee, while acting in good faith, shall not be liable or held responsible for any loss or depreciation in the value of the trust property resulting from any of the investments or reinvestments made by them.

Trust Agreement, ¶6.

Kim has been in the real estate business since 1980, managing and investing in real estate owned directly with her husband, in limited liability companies or in the

---

[2] In 2006, while KH Funding acted as property manager, it made a distribution to Kim, apparently in her personal capacity as income beneficiary. Kim forgot completely about this distribution and did not recall it at the time of her deposition, but raised it at trial to clarify the record. The Court finds no significance in the fact that there may have been one distribution to Kim in 2006, considering the 18 years existence of the Debtor, and considering the distribution was not made by Kim herself.

3

Debtor. Kim managed the Debtor the way she managed her other real estate investments. Her goal was to make the best business decisions she could make, after consulting with her mother and husband, in order to maximize the Trust's profits and the value of its assets. She operated the Debtor as a family real estate enterprise with the intention of maximizing family wealth, and fairly aggressively leveraged the initial real estate investment that was transferred to the Debtor in order to acquire additional real estate investments. Her actions were not reckless by the measure of a real estate investor, and were allowed by the Trust Agreement, but they were not consistent with a fiduciary's obligation to prudently protect and preserve the res of a trust.

Six years before the Debtor was created, in March 1987, the Grantor, Kim and her husband purchased the Mattapony Shopping Center (the "Mattapony Center") in Prince George's County, Maryland—the Grantor acquired a ninety percent interest while Kim and her husband each acquired a five percent interest. Kim managed the Mattapony Center for the Grantor, herself and her husband upon its acquisition in 1987.

Upon the Debtor's creation, the Grantor transferred into the Debtor her ninety percent interest in the Mattapony Center. Kim and her husband retained their collective ten percent interest in the Mattapony Center, although, as explained below, the economic value of those interests eventually made their way into the Debtor.

Kim continued to manage the Mattapony Center after the Grantor transferred her interest into the Debtor in the same way she managed it before the Debtor was created. Specifically, she discussed proposed actions with her mother and husband and took actions designed to maximize the profit from and value of the asset.

In 1994, Kim purchased on behalf of the Debtor a shopping center in Fredericksburg, Virginia (the "Fredericksburg Center") from Carl Silver. She saw an advertisement that stated the Fredericksburg Center could be acquired for $1.9 million with only a $100,000 down payment, and the rents from the center would be sufficient to service the debt. She thought it was a "good deal." Before she bought it she discussed the acquisition with her mother. The down payment came from retained profits from the Mattapony Center, and the balance of the purchase price was funded by a deed of trust loan from Eagle Bank and a note that the seller took back. Significantly, the seller's note was secured by a deed of trust against the Mattapony Center. Ex. 5 at 1.

In January 2003, the Debtor, Kim and her husband executed a deed of trust on the Mattapony Center to secure a personal obligation of Kim and her husband to Greenpoint Mortgage Funding, Inc. Ex. 7 at 1 ("Borrowers Hiun Ung Kim and Jim Suk Kim owe Lender the aggregate principal sum . . . as evidenced by a promissory note from Borrowers Hiun Ung Kim and Jim Suk Kim . . . .").

On May 1, 2006, Kim acquired on behalf of the Debtor La Union Mall ("La Union Mall") in Prince Georges's County, Maryland for $12,657,000. The transaction was structured as a like-kind exchange under §1031 of the Internal Revenue Code, pursuant to which the Debtor sold the Mattapony Center and the Fredericksburg Center through the like-kind exchange mechanism in order to provide the down payment for La Union Mall. In addition to the Debtor's down payment, the acquisition was financed by a first deed of trust loan in the amount of $9,100,000 from Virginia Commerce Bank, and an approximately $2.3 million second deed of trust loan from KF Funding Company. KH Funding also made an approximately $2 million loan to the Debtor for improvements.

5

Thus, in round numbers, the amount of equity the Debtor used to acquire La Union Mall was approximately $1,300,000 ($12,657,000 minus $9,100,000, from the first deed of trust, minus $2,300,000, from the second deed of trust) and the loan-to-value ratio of the first and second deed of trust loans against the purchase price exceeded 90%. Taking into account the $2 million improvements loan made by KH Funding, the total secured and unsecured debt incurred by the Debtor in the transaction exceeded the purchase price by $700,000.

The deed reflects that La Union Mall is titled solely in the name of the Debtor. It appears from the documents admitted into evidence that 100% of the like-kind exchange proceeds from the Mattapony Center went into the acquisition of La Union Mall. The Court therefore finds that Kim's and her husband's five percent interests in the Mattapony Center were used in the Debtor's acquisition of La Union Mall. Further, notwithstanding that La Union Mall is titled strictly in the Debtor's name, Kim and her husband are personally obligated on the Virginia Commerce Bank loan, along with the Debtor. Ex. 9 at p. KIM003276.

Prior to the acquisition of La Union Mall, Kim managed the Debtor. When KH Funding made its loan in the La Union Mall transaction, it began to manage the Debtor's real estate. Robert Harris, an executive with KH Funding, signed documents and took actions on behalf of the Debtor using the title of "Trustee" of the Debtor, but he has never been appointed as trustee. *See*, *e.g*., Ex. 21 at 20. In December, 2009, Kim, her husband and the Debtor, as borrowers, entered into a loan modification agreement with Virginia Commerce Bank. Ex. 14. An "integral part" of the loan modification agreement was that the Debtor would terminate KH Funding from doing anything associated with managing

6

the Debtor. *Id*. at ¶13.  Mr. Harris no longer signed documents as "Trustee" of the Debtor.

The Debtor directly employs twelve employees, six who provide security for the real estate operations and six who perform maintenance services.  The Debtor contracts directly with service providers and tenants at La Union Mall.

The Debtor has no formal board of directors or officers.  It was never registered with the state of Maryland as a business trust or a statutory trust.  It does not hold a certificate of trust nor does the beneficiary hold a certificate of ownership.

The Debtor commenced this case on March 1, 2011, by filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  The Debtor is operating as debtor-in-possession pursuant to 11 U.S.C. §§1107 and 1108.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).

## CONCLUSIONS OF LAW

Section 109(d) of the United States Bankruptcy Code[3] provides that "[o]nly a . . . person that may be a debtor under chapter 7 of this title . . . may be a debtor under chapter 11 . . . ."  11 U.S.C. §109(d).  The term "person" includes "individual, partnership, and corporation."  11 U.S.C. §101(41).  The term "corporation" includes a "business trust."  11 U.S.C. §101(9)(A)(v).  Thus, a "business trust" is eligible under §109(d) to file a Chapter 11 bankruptcy petition.  But a personal, family or testamentary trust—the primary purpose of which is to provide for the maintenance of the trust

---

[3] Unless otherwise noted, all statutory references herein are to the Bankruptcy Code, 11 U.S.C. §101 *et seq*., as currently in effect.

7

beneficiaries—is not eligible. *In re Hurst Trust*, No. 97-14562-PM, 1997 Bankr. LEXIS 997, at *9 (Bankr. D. Md. June 19, 1997). Accordingly, the Court must determine whether the Debtor is a business trust as that term is used in §101(9)(A)(v).

Numerous cases have addressed the issue of what constitutes a business trust under §101(9)(A)(v). Two circuit courts of appeal have done so, as have a number of bankruptcy courts within the Fourth Circuit. However, no uniform standard has emerged and the Fourth Circuit Court of Appeals has not addressed the issue.

The Sixth Circuit developed the "primary purpose" test to determine whether a trust is a business trust. The test consists of two propositions:

> First, "trusts created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors qualify as business trusts, while trusts designed merely to preserve the trust res for beneficiaries generally are not business trusts," and second, "the determination is fact-specific, and it is imperative that bankruptcy courts make thorough and specific findings of fact to support their conclusions"— findings, that is, regarding what was the intention of the parties, and how the trust operated.

*In re Kenneth Allen Knight Trust (Knight Trust)*, 303 F.3d 671, 680 (6th Cir. 2002) (internal citations omitted). The court in *Knight Trust* first concluded that the "definition of business trust properly belongs to federal, rather than state, law," *id*. at 679, because to "hold otherwise would result in different results in different states and an entity would be eligible for relief in one state but not another." *Id*. (quoting *In re Arehart*, 52 B.R. 308, 310-11 (Bankr. M.D. Fla. 1985)). The court next recognized that a number of court-made definitions of "business trust" exist and "indeed perhaps the only thing all cases have in common is the recognition that they all differ." *Id*. In adopting the primary purpose test, the court determined it to be "reasonably clear and workable, and reflects the intent of Congress." *Id*. at 680.

8

The court upheld the bankruptcy court's determination that the trust was a business trust, relying on the bankruptcy court's findings that the grantor/trustee treated the trust as he did all the other business entities, *id*. at 674-75, and that the primary purpose of the trust was to transact business for the benefit of the grantor, the investor, and not merely to preserve the trust res for the beneficiaries. *Id* at 680. In formulating the primary purpose test, the court held that neither transferable certificates of ownership, nor the trust's business activity being for profit are necessary requirements in determining whether a trust is a business trust. *Id*. at 676-77.

The Second Circuit in *In re Secured Equipment Trust of Eastern Airlines, Inc.(Secured Equipment)*, 38 F.3d 86, 89 (2d Cir. 1994) determined that a court must analyze several factors to find whether a trust is a business trust, with the first factor being whether the trust has attributes of a corporation. Next, a court must determine whether the trust was created "for the purpose of carrying on some kind of business," or whether the purpose was "to protect and preserve the res." *Id*. Then a court must consider whether the trust engages in business-like activities, although while a trust "must engage in business-like activities to qualify as a business trust, such activity, without more, does not necessarily demonstrate that a trust is a business trust." *Id*. Finally, the court must consider whether the trust provides benefits to the beneficiaries, which are not limited to profits. *Id*. at 90. The "presence or absence of a profit motive [is] influential" in determining the existence of a business trust. *Id*.

Ultimately, *Secured Equipment* held that there is no definitive list of characteristics, and that eventually, "each decision is based on a very fact-specific analysis of the trust at issue." *Id.* at 89; *See also In re Happy Trust Three*, 122 Fed.

9

Appx. 527, 528 (2d Cir. 2004) (court found that the trust never engaged in business activities, never turned a profit, did not presently and was unlikely to engage in business activities in the future, and was thus not a business trust).  Furthermore, even though the *Secured Equipment* trust qualified as a business trust under New York corporate law because it was an association that operated a business under a written instrument, and the beneficial interests were divided into shares, the court held that its focus must be on the trust documents and the totality of the circumstances, and not solely on whether a trust engages in business activities.  *Secured Equipment* at 91.

Here, looking solely at the Trust Agreement, the matter is not so clear.  The Trust Agreement on its face provides for income to Kim for life and allows Kim to determine who would receive the Debtor's assets through her will.  Trusts that are designed to provide income to a beneficiary for life while preserving the trust res for future beneficiaries "generally" are not business trusts.  *Knight Trust* at 680.  However, the Trust Agreement gives Kim virtually unfettered discretion to invest the Debtor's assets as she sees fit without regard to any rules of diversification, and insulates her from liability for any actions taken in good faith.  It allows Kim to take all assets from the Debtor at any time, in her sole discretion, limited only to the extent advisable "for her support and health, or to maintain her in the standard of living to which she has been accustomed."  Trust Agreement, ¶6.

The Movant's expert's testimony was not especially probative on the issue.  He testified that there are two reasons a party would use a trust, as opposed to a corporate entity.  The first often arises in family situations, where there is a concern about the maturity of the beneficiary, and the grantor names an independent trustee to manage the

10

trust property. This reason would be significant under *Knight Trust* if the record establishes that the trustee functions primarily to protect and preserve the res for future beneficiaries. But this reason has little significance here, because the record did not establish that the Debtor was established or is operated for this reason. The second reason is tax planning. It is clear from the expert's testimony that tax planning was the motivating factor behind the creation of the Debtor. But tax planning alone does not establish whether the trust is created for a business or a profit purpose or to protect and preserve the res.

No case of which this Court is aware looked solely to the formation document in reaching a determination. The one overriding principle that emerges from the cases is that the determination of whether a trust is a business trust is fact-specific and focuses on the purpose and operations of the trust. Under this broader view, the Court concludes the Debtor is a business trust.

As set forth in the Findings of Fact, from the moment of its inception, Kim managed the Debtor to maximize its profits and the value of its assets in order to enhance the overall wealth of her family. She managed it, and the real estate assets it acquired, the same way she ran her other businesses, without regard to trust principles, including traditional trust principles of prudent, diversified investment and protection of trust res. She did not pay to the income beneficiary (*i.e.,* herself) any income from the Debtor, instead reinvesting it to maximize the Debtor's value. As the following facts establish, Kim used the Debtor's initial real estate investment in Mattapony Center to acquire additional real estate investments in order to maximize the Debtor's value. While the

11

Court would not conclude Kim's actions were reckless, they were not consistent with a fiduciary's obligation to prudently protect and preserve the res of a trust.

- Kim purchased on behalf of the Debtor the Fredericksburg Center with a minimal amount of down payment and a traditional deed of trust loan, but also with the seller taking back a note secured by the Mattapony Center.
- Kim secured personal obligations of her and her husband for investment purposes with Debtor's assets.
- The acquisition of La Union Mall was a highly leveraged transaction, with an initial secured loan-to-value ratio of 90% and total secured and unsecured debt that exceeded the purchase price by $700,000.
- The deed reflects that La Union Mall is titled solely in the name of the Debtor, and it appears that Kim's and her husband's five percent interests in the Mattapony Center were used in the Debtor's acquisition of La Union Mall.
- Kim is and has been personally obligated on a number of the Debtor's loan obligations, and there would no need for a trustee to guaranty trust obligations if the purpose of the Debtor was to protect and preserve the trust res.
- Although Kim's husband has no beneficial interest in the Debtor on the record before the Court, he is personally obligated on a number of the Debtor's obligations.

The Court concludes that the purpose of the Debtor was to transfer the economic interest of ninety percent of the Mattapony Center to Kim from her mother, in a manner that resulted in tax benefits, but which was intended to allow Kim to continue to manage the Mattapony Center and any other assets the Debtor acquired the same as she operated her other real estate ventures. It also allowed Kim to realize the value from the transfer if she chose while continuing to expand her real estate business as she saw fit. The Court concludes the Debtor is a business trust.

Movant cites to this Court's opinion in *In re Mortgage Banking Trust (Nash)*, 2008 WL 3126186 (Bankr. D.Md. 2008), to support its contention that the Debtor is not a business trust. But a comparison of the *Nash* trust and the Debtor illustrates the

importance of the detailed fact-findings required by both the Sixth and Second Circuits as necessary to determine the true purposes and operations of the trust.  The *Nash* trust was established along with several other trusts as part of the grantor's marital and estate planning, and its purpose was to "hold certain property, and to provide for the maintenance, care, comfort and support of [the grantor and his] beneficiaries . . . ."  *Id.* at *1.  Of critical distinction, the *Nash* trust, in both its purpose and operation, was intended to protect prudently the trust res for beneficiaries.

Finally, Movant argues that the Debtor does not qualify as a statutory business trust under Maryland law.  But this Court adopts the view of *Knight Trust* that "definition of business trust properly belongs to federal, rather than state, law."  *Knight Trust* at 679.

## CONCLUSION

For the foregoing reasons the Court will deny the motion to dismiss.  An order will follow.

cc:    Debtor
       Debtor's Counsel
       Movant
       Movant's Counsel
       Office of the United States Trustee

**END OF MEMORANDUM**